2017-129

---

# United States Court of Appeals
# for the Federal Circuit

---

IN RE CRAY INC.,
*Petitioner*

---

On Petition for Writ of Mandamus to the United
States District Court for the Eastern District of Texas in
No. 2:15-cv-01554-JRG, Judge J. Rodney Gilstrap.

---

## RESPONSE TO PETITION FOR WRIT OF MANDAMUS

---

Thomas J. Filarski (Lead Counsel)
Daniel S. Stringfield
STEPTOE & JOHNSON LLP
115 S. LaSalle St., Suite 3100
Chicago, IL 60603
Phone: (312) 577-1300

Christopher M. Re
Fang Bu
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
Phone: (202) 429-3000

John Josef Molenda
STEPTOE & JOHNSON LLP
1114 Ave of the Americas, 35th Floor
New York, NY 10036
Phone: (212) 506-3900

*Counsel for Respondent*
*Raytheon Company*

August 1, 2017

# CERTIFICATE OF INTEREST

Pursuant to Federal Circuit Rules 28(a)(1) and 47.4, counsel for Respondent Raytheon Company certifies the following:

1.      The full name of every party represented by me is:  Raytheon Company.

2.      The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:  N/A.

3.      All parent corporations and any publicly held companies that own 10% or more of the stock of any party represented by me are: None.

4.      The names of all law firms and the partners or associates that have appeared for the parties now represented by us in the trial court or are expected to appear in this Court are:  Thomas J. Filarski, John J. Molenda, Daniel S. Stringfield, Robert F. Kappers, Matthew M. Zuziak, Sanjeet K. Dutta, Stephanie L. Roberts, Robert Greenfeld, Brian G. Fahrenbach, Christopher M. Re, and Fang Bu of Steptoe & Johnson LLP; and William E. Davis, III, and Edward Chin of The Davis Firm P.C.


Dated:  August 1, 2017            /s/ John Josef Molenda
                                  John Josef Molenda
                                  STEPTOE & JOHNSON LLP
                                  1114 Avenue of the Americas, 35th Floor
                                  New York, NY 10036
                                  Phone:  (212) 506-3900

                                  *Counsel for Respondent Raytheon Company*

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ..................................................................i

TABLE OF AUTHORITIES ..................................................................iv

COUNTERSTATEMENT OF THE ISSUES...........................................1

INTRODUCTION ...................................................................................1

COUNTERSTATEMENT OF FACTS NECESSARY  TO UNDERSTAND THE ISSUES PRESENTED.............................................................................3

    I.    The Parties And Their Connections To The Eastern District....................3

        A.    Raytheon Company ..........................................................3

        B.    Cray Inc...........................................................................4

            1.    Cray Employee Douglas Harless and His Activities in the Eastern District.............................................................5

            2.    Cray Employee Troy Testa and His Activities in the Eastern District............................................................................6

    II.    Procedural History .........................................................................7

REASONS WHY THE WRIT SHOULD BE DENIED .........................................10

    III.    Relevant Legal Standards For The "Strong Medicine" Of Mandamus.....10

    IV.    The District Court Did Not Clearly Abuse Its Discretion In Holding That Venue Was Proper Under This Court's Decision In *Cordis* .............12

        A.    The District Court Correctly Followed *Cordis* in Deciding that Cray Had a "Permanent and Continuous Presence" in the Eastern District .....................................................................12

        B.    The Facts of This Case "Closely Parallel" Those in *Cordis* and Fully Support the District Court's Determination that Venue Is Proper in the Eastern District...........................................................15

V.    While Neither The Plain Language Of § 1400(b) Nor This Court's
      *Cordis* Decision Requires That The "Place Of Business" Be A
      "Physical Location," A Home Office Is Plainly A Physical Location ......22

VI.   This Case Is Not The Appropriate Vehicle To Address The Propriety
      Of The District Court's Four-Factor Venue Test, Which Is Advisory
      And Was Not Applied To The Facts Of This Case ..................................26

VII.  If This Court Were To Grant Cray's Petition, It Should Remand To
      The District Court For Further Venue-Related Proceedings .....................28

CONCLUSION ......................................................................................................29

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*62 Cases, More or Less, Each Containing Six Jars of Jam v. United States*,
340 U.S. 593 (1951)................................................................23

*American Cyanamid Co. v. Nopco Chemical Co.*,
388 F.2d 818 (4th Cir. 1968) ...............................................15

*Arctic Corner, Inc. v. United States*,
845 F.2d 999 (Fed. Cir. 1988) ..............................................27

*Bankers Life & Casualty Co. v. Holland*,
346 U.S. 379 (1953)................................................................11

*Bates v. United States*,
522 U.S. 23 (1997)..................................................................23

*Dean v. United States*,
556 U.S. 568 (2009)................................................................23

*Gaddis v. Calgon Corp.*,
449 F.2d 1318 (5th Cir. 1971) .............................................20

*Grantham v. Challenge-Cook Bros., Inc.*,
420 F.2d 1182 (7th Cir. 1969) .............................................14

*In re Cordis*,
769 F.2d 733 (Fed. Cir. 1985) .....................................*passim*

*In re Dien*,
680 F.2d 151 (C.C.P.A. 1982) .........................................3, 27

*In re Keil*,
808 F.2d 830 (Fed. Cir. 1987) ..............................................27

*In re Regents of Univ. of California*,
101 F.3d 1386 (Fed. Cir. 1996) ............................................11

*TC Heartland LLC v. Kraft Foods Group Brands LLC*,
    137 S. Ct. 1514 (2017)................................................................8, 10

*University of Illinois Foundation v. Channel Master Corp.*,
    382 F.2d 514 (7th Cir. 1967) ...............................................14

*W.S. Tyler Co. v. Ludlow-Saylor Wire Co.*,
    236 U.S. 723 (1915)...........................................................13, 14

**Statutes**

15 U.S.C. § 7706(f)(7)(B) .........................................................24

28 U.S.C. § 1400(b) ...........................................................*passim*

28 U.S.C. § 1406(a) ...........................................................8, 28

42 U.S.C. § 1320d-5(d)(6)(B)...................................................24

**Other Authorities**

29 Cong. Rec. 1900, 1902, 54th Cong., 2d Sess. (1897)..................................24, 25

**COUNTERSTATEMENT OF THE ISSUES**

1.      Whether the district court clearly abused its discretion, amounting to a judicial usurpation of power, in holding that Cray Inc.'s permanent and continuous presence in the Eastern District of Texas constituted a "regular and established place of business" under this Court's decision in *In re Cordis*, 769 F.2d 733 (Fed. Cir. 1985)?

**INTRODUCTION**

A writ of mandamus is "strong medicine" that is reserved for only the most exceptional cases.  *In re Cordis*, 769 F.2d 733, 737 (Fed. Cir. 1985).  This case is not one of them.  To deny Cray Inc.'s ("Cray's") petition, this Court need only determine that the district court made a "rational and substantial legal argument" in holding that Cray's permanent and continuous presence in the Eastern District of Texas ("Eastern District") constituted a "regular and established place of business" under *Cordis*.  Given the district court's methodical and thoughtful application of *Cordis* to the "closely parallel" facts of this case, which amicus Gilead concedes is in the "same" posture as *Cordis*, Gilead Br. 10 n.3, the district court's decision easily satisfies that low bar.  Cray therefore cannot show that the district court committed a "clear abuse of discretion" or that Cray has a "clear and indisputable right" to a writ.  Cray's petition should therefore be denied.

While Cray spends much of its brief attempting to minimize its connections to the Eastern District, Pet. Br. 1-6, 17-21, the record is clear that those

connections are deep and substantial. They constitute the "permanent and continuous presence" that this Court found outcome-determinative in *Cordis*. Those connections include, at a minimum, two salespeople, Douglas Harless and Troy Testa, who sold high-performance computers ("HPCs") out of home offices in the Eastern District, with sales totaling over $345 million in aggregate. Following a thorough analysis of those facts, and the careful application of the law set forth in *Cordis* to those facts, the district court concluded that Harless' home office, and the business-related activities he conducted from it, constituted a "permanent and continuous presence" sufficient for venue to lie in the Eastern District. Appx71-75. That well-reasoned decision did not constitute a clear abuse of discretion that would warrant mandamus relief.

Moreover, it is important to focus on what this case is about and what it is not. This case *is* a straightforward application of the "regular and established place of business" analysis set forth in *Cordis* to the particular facts of this case. This case *does not* involve the application of *Cordis* to the unique facts of any other pending or future cases in the Eastern District or in any other district, amicus Gilead's pleas notwithstanding.

And this case *is certainly not* a referendum on the district court's four-factor test for determining whether a "regular and established place of business" exists. The district court specifically crafted that test to assist in the resolution of venue

2

issues in pending and future cases in the Eastern District, Appx76, ***not*** the venue

issues in this case, Appx84 n.13 (noting that "the Court declines to expressly apply

the factors above in this particular case").  Cray itself acknowledges that the

portion of the district court's opinion concerning the four-factor test was advisory

in nature.  Pet. Br. 22, Heading IV (characterizing that portion of opinion as

"Advisory Guidance").  It is black letter law that Article III courts cannot review

advisory opinions.  *See*, *e.g.*, *In re Dien*, 680 F.2d 151, 155 (C.C.P.A. 1982) ("To

review an advisory opinion would be to give one.").  This Court should thus reject

Cray's and amici's attempts to reach beyond this case into pending and future

cases that have nothing to do with this one.  Pet. Br. 2-3, 10-12; Gilead Br. 2-3, 10;

HTIA Br. 1-3, 7-8, 14-17.

Because the district court's application of *Cordis* to the facts here involved

neither a "clear abuse of discretion" nor "usurpation of judicial power," *Cordis*,

769 F.2d at 736, this Court should deny Cray's petition.

## COUNTERSTATEMENT OF FACTS NECESSARY TO UNDERSTAND THE ISSUES PRESENTED

### I.    The Parties And Their Connections To The Eastern District

### A.    Raytheon Company

Respondent Raytheon Company ("Raytheon") is an innovation leader

specializing in defense, civil government, and cybersecurity technology.  Raytheon

invested enormous resources and capital to develop pioneering HPC innovations,

for which numerous U.S. and foreign patents have been awarded. Those patents include the four patents-in-suit: U.S. Patent Nos. 7,475,274; 8,190,714; 8,335,909; and 9,037,833. Raytheon's business unit responsible for the innovations disclosed in the patents-in-suit is located in the Eastern District. And statewide, Raytheon employs almost 8,000 Texans and contributes almost $1B to the Texas economy annually.

### B.    Cray Inc.

Petitioner Cray is a company specializing in the design and manufacture of supercomputers. While incorporated in Washington and maintaining a principal place of business in Seattle, Pet. Br. 4, Cray, like Raytheon, has maintained a substantial presence in Texas generally and the Eastern District specifically. Cray maintains six manufacturing and distribution facilities throughout the United States, two of which are in Texas: one in Austin and one in Houston. *Id.*

With respect to the Eastern District specifically, Cray has maintained a permanent and continuous presence there for over seven years. That presence was maintained by at least two of Cray's salespeople, Douglas Harless and Troy Testa, both of whom worked out of home offices in the Eastern District. As detailed below, their presence belies Cray's contention that "Cray's only connections to the district are the private residence of a Cray employee and its reimbursement of that employee when he used personal belongings for business." Pet. Br. 1-2.

1.    **Cray Employee Douglas Harless and His Activities in the Eastern District**

From 2008 until after the 2015 filing of the complaint in this case, Cray employed Harless to sell and manage accounts for its HPC products out of his Athens, Texas home office within the Eastern District. Appx248-249 (¶¶ 25-27); Appx251-255; Appx597-604; Appx605-621.  He maintained no other significant job during that time period. *See* Appx248 (¶¶ 25-26); Appx251-255.  Harless advertised via the Internet that he was stationed in Athens and was responsible at Cray for sales, new account development, and key accounts management. Appx248 (¶¶ 25-26); Appx251-255.

Significantly, a Cray presentation entitled "Mid Year Sales Planning," illustrates a map of Cray's "Americas Sales Territories," identifying Athens, Texas and listing Harless as a "Named Account Manager."  Appx504-505 (¶¶ 4-5); Appx404-406.  This map is consistent with correspondence from Harless to customers such as Shell Oil Company, in which he provided his "Office" telephone number with a "903" area code that is associated with several counties in the Eastern District.  *See*, *e.g.*, Appx505-506 (¶ 6) & Appx571-573 (email sent to Shell employees and copying Cray employees in which Harless provided a "proposal for [Shell's] Intel Haswell-EP systems for Shell R&D," signing as "Doug Harless, Cray Sales, ***Office: 903***-677-3684, harless@cray.com").

5

Harless served as the Account Manager for at least twenty-one separate sales of accused HPC products to at least eight different customers. Appx506-508 (¶¶ 8-9); Appx605-621. Those customers, several of whom participate in the oil and gas industry for which Harless was responsible, purchased one of Cray's accused XE, XK and/or XC supercomputers. Appx506-508 (¶¶ 8-9); Appx605-621. The value of recognized revenue for the accused sales attributed to Harless exceeds $345 million—or about 21% of Cray's total recognized product revenue for accused sales during a similar timeframe. Appx506-508 (¶¶ 8-9); Appx605-621.

With respect to compensation, Cray paid Harless based on his HPC and HPC-related sales activities. Appx370 (¶ 4). Cray also reimbursed him for business-related cell phone usage, Internet fees, and travel costs. *Id.* Additionally, Harless was provided administrative support in Cray's Minnesota office so that he could perform his job duties in the Eastern District. Appx370 (¶ 5).

### 2. Cray Employee Troy Testa and His Activities in the Eastern District

During 2010-2011, Cray also employed Testa as a "Sr. Territory Manager." Appx503-504 (¶ 2); Appx399-403. Like Harless, Testa worked from a home office in the Eastern District and advertised via the Internet that he sold Cray's HPC systems, including "Intel based HPC Solutions (Hardware/Software/ Management) for CX Team." Appx503-504 (¶¶ 2-3); Appx399-403; Appx513-570. Testa advertised that he "[s]old $132,000 system at 41% margin within first

three months of joining Cray," "[c]losed six new customers in first year including

Areva, Amgen and Weir Oil," and "[h]ad a pipeline of over $6,000,000 on a

$2,500,000 quota"—all for Cray while he resided in the Eastern District. Appx503-

504 (¶¶ 2-3); Appx399-403; Appx513-570.

## II.    Procedural History

On September 25, 2015, Raytheon sued Cray in the Eastern District, alleging

that Cray had directly or indirectly infringed the patents-in-suit by way of its

activities relating to its HPC products.  Cray thereafter filed the first of a series of

unsuccessful venue-related motions.  To wit, on November 25, 2015, Cray filed its

first motion to dismiss or transfer for improper venue, arguing, *inter alia*, that

Cray's contacts with the Eastern District failed to establish venue there because

Cray purportedly did not reside, maintain an established place of business, or

commit acts of alleged infringement in the district. Appx219-241.

Following an oral hearing, the magistrate denied that motion, basing its

conclusion on the factual findings that, *inter alia*, Cray had (1) employed sales

representative Harless for over seven years in the Eastern District, and (2) sold an

accused XC40 supercomputer to the University of Texas system that was accessed

at several campuses in the Eastern District. Appx299-306.  On September 21,

2016, the district court ultimately adopted the magistrate's conclusions. Appx319-

320.  Significantly, at the time of their decisions, neither the district court nor the

7

magistrate was aware of additional highly relevant, but undisclosed, information concerning Cray's contacts with the Eastern District, a consequence of Cray's "fail[ure] to meet its discovery obligations in this case."  Appx59 n.1 (summarizing Cray's venue-related discovery failures).[1]

On June 1, 2017, a mere three months before this case was to be tried, Cray moved to transfer venue under 28 U.S.C. § 1406(a), arguing that venue was improper in view of *TC Heartland LLC v. Kraft Foods Group Brands LLC*, 137 S. Ct. 1514 (2017).  Appx331-351; Appx60-61.  Specifically, Cray argued that venue was improper because (1) Cray did not "reside" in the Eastern District and (2) Cray had not committed acts of infringement and had no regular and established place of business in the Eastern District.  Appx335; Appx61.

On June 29, 2017, the district court denied Cray's motion in a carefully written, 27-page opinion.  With respect to the first "residence" prong of 28 U.S.C. § 1400(b), the district court agreed that Cray does not "reside" in the Eastern District, because Cray is incorporated in Washington, not Texas.  Appx64.

---

[1] That information included, *inter alia*, the fact that Cray had also employed Testa as a senior territory manager in the Eastern District, as well as documentation revealing the full extent of Harless' contacts with the Eastern District.  Appx59-60 & Appx59 n.1.  It is unknown whether Cray failed to disclose additional venue-related information.  For example, Cray never certified that it has no other employees in the district. Appx421-429.

The district court held, however, that Cray satisfied both subprongs of the second prong of § 1400(b). As for the "acts of infringement" subprong, the district court held that Raytheon's allegations of induced infringement concerning use of the XC40 supercomputer sold to the University of Texas system, plus Harless' offers to sell when working in the Eastern District, together satisfied this subprong. Appx65-71. Cray does not challenge these determinations in its petition.

The district court concluded that the "regular and established place of business" subprong was satisfied, relying upon this Court's decision in *Cordis*. In a detailed review of case law stretching back to 1941, the district court set forth the competing lines of authority analyzing whether an "established place of business" required a physical presence. Appx72. The district court noted that this Court resolved these competing lines of precedent in *Cordis*, which determined that a "permanent and continuous presence" rather than a "fixed physical presence in the sense of a formal office or store" was required. Appx72-73 (quoting *Cordis*, 769 F.2d at 737). Based upon this standard, and that "[t]he facts in the present case closely parallel the facts in *Cordis*," the district court held that Harless' extensive array of activities in the Eastern District satisfied the "regular and established place of business" subprong of § 1400(b). Appx74-75.

Lastly, with respect to the many other outstanding venue cases in the Eastern District, the district court noted that there was "uncertainty" surrounding the phrase

"regular and established place of business" after *TC Heartland*.  Appx76.

Accordingly, the district court undertook a thorough analysis of the case law

interpreting this phrase for the benefit of future litigants.  In doing so, the Court

took into account how "[t]echnology has revolutionized the way businesses operate

and the way customers interact with those businesses."  Appx76-79.  Based upon

its analysis, the district court arrived at a four-factor test for determining "regular

and established place of business" that looked at a defendant's (1) physical

presence, (2) representations, (3) benefits received, and (4) targeted interactions

with the district.  Appx79-83.  Although the district court indicated that, had it

applied these four factors here, it would have reached the same result as it had

under *Cordis*, the district court declined to apply its test to the facts of this case.

Appx84 n.13.  Rather, the district court indicated that it had decided the issue of

venue based exclusively upon *Cordis*.  *Id.*

        With the first of three trials scheduled to start at the end of August, and in a

last-ditch move to delay Raytheon's vindication of its patent rights, Cray has now

filed this petition for writ of mandamus seeking to overturn the district court's

venue determination.

## REASONS WHY THE WRIT SHOULD BE DENIED

## III.    Relevant Legal Standards For The "Strong Medicine" Of Mandamus

        The remedy of mandamus is "'strong medicine' to be reserved for the most

serious and critical ills." *Cordis*, 769 F.2d at 737.  Therefore, the use of mandamus

must be "limited to exceptional circumstances to correct 'a clear abuse of discretion or usurpation of judicial power' by the trial court." *Id.* at 736 (quoting *Bankers Life & Casualty Co. v. Holland*, 346 U.S. 379, 382 (1953)).  Cray bears the heavy burden of demonstrating that its right to a writ is "clear and indisputable" and that there is no "adequate alternative means to obtain the relief sought."  *In re Regents of Univ. of California*, 101 F.3d 1386, 1387 (Fed. Cir. 1996).  If a "rational and substantial legal argument" may be made supporting the rule at issue, mandamus is not appropriate, even if reversible error might be found in the course of a normal appeal.  *Cordis*, 769 F.2d at 737.

    As detailed below, Cray is unable to carry its heavy burden to show a "clear and indisputable right" to a writ of mandamus.  The district court made rational and substantial legal arguments in concluding that *Cordis* squarely applied to the facts of this particular case, especially given that the posture of this case is identical to the one in *Cordis*.  Gilead Br. 10 n.3 (conceding that the postures of this case and *Cordis* are "the same").  Accordingly, the district court did not commit a "clear abuse of discretion" that amounts to a judicial usurpation of power.  Cray's petition should therefore be denied.

**IV.    The District Court Did Not Clearly Abuse Its Discretion In Holding That Venue Was Proper Under This Court's Decision In *Cordis***

   **A.    The District Court Correctly Followed *Cordis* in Deciding that Cray Had a "Permanent and Continuous Presence" in the Eastern District**

Cray first argues that the district court erroneously interpreted § 1400(b) as not requiring a physical presence within the district.  Pet. Br. 13-17.  But this argument is flatly contradicted by the district court's decision.  The district court both quoted from, and applied, this Court's reasoning in *Cordis*, which decided that a "regular and established place of business" for venue purposes can be established by a showing of "permanent and continuous presence" by the defendant.  After providing a detailed summary of the facts of *Cordis*, the district court stated:

> Based on these facts, the Federal Circuit denied Cordis's petition for a writ of mandamus.  [*Cordis*, 769 F.2d] at 734.  It ultimately concluded that "the appropriate inquiry is whether the corporate defendant does its business in that district through a permanent and continuous presence there and not . . . whether it has a fixed physical presence in the sense of a formal office or store." *Cordis*, 769 F.2d at 737.

Appx73.  The district court proceeded to apply this reasoning, finding that the facts in this case and those in *Cordis* were "closely parallel."  Appx74.  Based on its analysis, the district court held that "[t]he activities performed by Cray in this Court's view are factually similar to the activities performed by the representatives in *Cordis* and therefore are sufficient to meet the 'regular and established place of

business' requirement of §1400(b)." Appx75. In view of the foregoing, it is readily apparent that the district court applied this Court's reasoning in *Cordis*, which requires physical presence in the form of a "permanent and continuous presence" within the district (albeit not a "fixed physical presence").[2]

Cray next argues that the district court's *Cordis*-based decision is somehow in tension with the Supreme Court's decision in *W.S. Tyler Co. v. Ludlow-Saylor Wire Co.*, 236 U.S. 723 (1915), along with several regional circuit cases that substantially predated *Cordis*. Pet. Br. 13-15. Each of those cases can easily be distinguished.

With respect to *Tyler*, the district court characterized Cray's interpretation of that case as "oversimplified" and in direct contravention of *Cordis*. Appx75. The district court correctly distinguished *Tyler*, reasoning that unlike this case, the representative in *Tyler* was employed by two companies, had his wages allocated between those companies, and only had the authority "to solicit orders and forward them when received to the home office for execution." *Id.* (quoting *Tyler*, 236 U.S. at 725 and citing Appx424.) Moreover, while in *Tyler* "only one sale appear[ed] in the record, and this was negotiated by the purchaser in order that it might afford

---

[2] To the extent Cray argues that the district court's four-factor test does not require a physical presence in the district, that portion of the district court's decision was advisory in nature and this Court has no jurisdiction to review it. *See* Section VI, *infra*.

13

the basis for a suit," 236 U.S. at 725, in this case Harless made ***at least twenty-one sales*** totaling over $345 million.

The regional circuit cases also are readily distinguished.  As for *University of Illinois Foundation v. Channel Master Corp.*, 382 F.2d 514 (7th Cir. 1967), the sales representative did not store antenna products or samples at home.  Here, however, Harless could not store products (supercomputers) at his home office in view of their size, but he nonetheless easily could have provided online marketing materials describing Cray's HPC products to his customers.  *See* Appx508-509 (¶ 10) (citing testimony of Cray's 30(b)(6) witness concerning use of promotional materials by salespeople); Appx410-411 (158:4-159:22); Appx412-413 (166:15-167:17); Appx342 (Cray stating that "given that the accused systems take up entire rooms and weigh thousands of pounds, it would not have been possible for Harless to store or manufacture them at his home").  Moreover, while in *Illinois* there was no evidence that salespersons conducted demonstrations, the evidence here suggests the contrary. Harless was the top seller of HPCs to the oil and gas industry, *see* Appx251-255, and was listed as the Account Manager for at least twenty-one sales to at least eight customers of Cray's XE, XK and/or XC supercomputers accused in this case.  Appx506-508 (¶¶ 8-9); Appx605-621.

In *Grantham v. Challenge-Cook Bros., Inc.*, 420 F.2d 1182, 1184-85 (7th Cir. 1969), the court held that the presence of a non-exclusive distributor of

defendant's products in the district was insufficient to subject the defendant to suit there. Here, by contrast, Harless was employed exclusively by Cray to sell only Cray products. Appx248 (¶¶ 25-26); Appx251-255. And in *American Cyanamid Co. v. Nopco Chemical Co.*, 388 F.2d 818, 819 (4th Cir. 1968), a regional manager of the defendant resided in the district but made no sales. Here, Harless resided in the Eastern District and made sales of over $345 million.

### B. The Facts of This Case "Closely Parallel" Those in *Cordis* and Fully Support the District Court's Determination that Venue Is Proper in the Eastern District

Cray next contends that "[t]he facts supporting the conclusion in *Cordis* simply are not present here" and provides a table of facts in support of its position. Pet. Br. 17-18. But Cray's arguments, and the incomplete fact table accompanying them, are simply at odds with the facts of this case. Indeed, in the course of its extensive factual analysis, the district court noted multiple times how strikingly similar the facts of this case are to the facts in *Cordis*. Appx74 (noting that the facts were "closely parallel"); Appx75 (noting that the activities performed by Cray's employee Harless and those by the representatives in *Cordis* were "factually similar"). Those similarities are summarized in the complete fact table below:

| | |
|---|---|
| Cordis employed two salespeople in the district. | Cray employed Harless to sell and manage accounts for its HPC products out of his Athens, Texas home office in E.D. Tex. Appx248-249 (¶¶ 25-27); Appx251-255; Appx597-604.<br><br>• Map of Cray's "Americas Sales Territories" identified |

|  | Athens, Texas and credited Harless as a "Named Account Manager." Appx504-505 (¶¶ 4-5) & Appx404-406.<br><br>• Harless publicly advertised on LinkedIn that:<br><br>  ○ He was a Cray Sales Executive located in Athens;<br><br>  ○ His responsibilities included sales, new account development, and key accounts management; and<br><br>  ○ He was "#1 in new account development over [the] past several years."<br>  Appx248 (¶¶ 25-26) & Appx251-255.<br><br>• Harless' accused sales revenue exceeded $345 million, and he was Account Manager for at least 21 separate sales of accused products to at least 8 different customers. Appx506-508 (¶¶ 8-9) & Appx605-621.<br><br>Cray employed Testa as a "Sr. Territory Manager" in E.D. Tex. Appx503-504 (¶¶ 2-3); Appx399-403; Appx513-570.<br><br>• Testa publicly advertised on LinkedIn that:<br><br>  ○ He sold Cray's HPC products;<br><br>  ○ He sold a $132,000 system at 41% margin within his first three months at Cray;<br><br>  ○ He closed six new customers for Cray in his first year; and<br><br>  ○ He had a pipeline of over $6 million at Cray.<br><br>  Appx503-504 (¶ 2) & Appx399-403. |
|---|---|
| Cordis' salespeople work full-time and exclusively for Cordis. | • At filing, Harless had worked exclusively and full-time for Cray for over 7 years. Appx248 (¶ 26); Appx251-255.<br><br>• Testa worked exclusively and full-time for Cray from 2010 to 2011. Appx503-504 (¶ 2) & Appx399-403. |
| Two salespeople lived in the district. | • Harless and Testa lived in E.D. Tex. Appx248 (¶¶ 25-26); Appx251-255; Appx370 (¶ 5); Appx503-504 (¶¶ 2-3); Appx399-403; Appx513-570. |

| | |
|---|---|
| Cordis' salespeople were salaried. | • Harless was salaried for his sales activities at Cray.*[3] Appx370 (¶¶ 4-5). |
| Cordis' salespeople maintained home offices. | • Harless and Testa maintained home offices in E.D. Tex. Appx248 (¶¶ 25-26); Appx251-255; Appx370 (¶ 5); Appx503-504 (¶¶ 2-3); Appx399-403; Appx513-570. |
| Cordis' salespeople stored Cordis literature, documents, and products in their homes. | • Harless and other salespeople had access to online Cray brochures and would provide them to customers.* Appx508-509 (¶ 10) & Appx412-413 (166:24-167:17). |
| Cordis hired a secretarial service located in the district that answered calls as "Cordis Corporation" and provided administrative support. | • Cray offered direct administrative support for Harless to work from his home in E.D. Tex.* Appx370 (¶ 5).<br><br>• Cray reimbursed Harless for his "office" phone with an E.D. Tex. area code, as well as for his internet fees.* Appx370 (¶¶ 4-5). |
| Business cards of the salespeople listed phone number of the secretarial service and telephone | • Harless listed his home office phone number, having an area code associated with several counties in E.D. Tex., as an office line in emails to clients, sales proposals, and price quotations.* Appx505-506 (¶¶ 6-7) & Appx571-575.<br><br>• Cray identified Athens and Harless in its map of "Americas Sales Territories."* |

---

[3] For items marked with an asterisk, Cray has not provided discovery regarding the nature of Testa's compensation and work arrangements. At the same time, Cray has not argued that Testa's arrangements differed materially from Harless'.

| directory listed address of the secretarial service as Cordis' address. | Appx504-505 (¶¶ 4-5) & Appx404-406. |
|---|---|
| Cordis provided salespeople with company-owned cars. | • Cray reimbursed Harless' mileage and other costs for business travel.* Appx370 (¶¶ 4-5). |
| Activities of the salespeople were not limited to sales, but including support, presentations, and consultation. | • Apart from sales, Harless' activities included new account development and key accounts management.* Appx248 (¶¶ 25-26); Appx251-255. |
| Cordis' salespeople had authority to sell and deliver the accused product directly to a customer in the district. | • Harless had authority to prepare and send price quotations and proposals to customers, listing himself as the account executive.* Appx505-506 (¶¶ 6-7) & Appx571-575. |
| Customers located in the district. | • Cray sold an accused XC40 supercomputer to the University of Texas system, which has two institutions located in E.D. Tex.  Appx66 n.6; Appx299-300; Appx227; Appx622-623. |

As this table plainly demonstrates, there is no meaningful difference in the

evidentiary record between Cray employees Harless and Testa in this case, and the

two salespersons in *Cordis*.  To the extent it could be argued that there are minor

differences between the two sets of facts, the district court's conclusion that they

are "closely parallel" is not only rational, but a far cry from "a clear abuse of discretion" or "usurpation of judicial power" that could justify a writ here.

Cray's attempts to diminish the importance of Harless' and Testa's home offices in the Eastern District, and the extensive activities conducted from those offices, are unavailing. With respect to the home offices, Cray argues that it "played no part in selecting" the location of Harless' home office, paid no portion of it, and did not contribute to its maintenance costs. Pet. Br. 5-6. But in hiring Harless, who Cray admits was "a long time resident of Athens [Texas]" and who lived in the Eastern District prior to working for Cray, Pet. Br. 4, Cray made a conscious decision to select Harless to operate as its agent within the Eastern District. And although Cray may not have directly paid for Harless' home and its maintenance, Cray compensated Harless sufficiently to induce him to utilize at least a portion of that home for conducting Cray's business. Pet. Br. 18 (admitting that Harless was a "salaried" employee). Likewise, by hiring Testa, whose residency with the Eastern District predated his employment with Cray, Cray selected yet another "long time" Eastern District resident as its agent to operate from within the district. Appx503-504 (¶¶ 2-3); Appx399-403; Appx513-570. As

with Harless, Cray presumably compensated Testa sufficiently to induce him to utilize at least a portion of his home for conducting Cray's business.[4]

With respect to Harless' activities, Cray contends that all of his customers were outside the Eastern District and therefore do not count for purposes of venue determination. Pet. Br. 5.  Apart from ignoring Harless' extensive activities set forth above, the fact that Cray maintained Harless as its salaried sales agent for a period of over seven years—notwithstanding the geographic location of his customers—simply underscores the importance of Harless' activities on behalf of Cray from within the Eastern District.  Moreover, Cray's argument is contrary to Fifth Circuit precedent holding that the "regular and established place of business" need not be connected to the "acts of infringement." *See Gaddis v. Calgon Corp.*,449 F.2d 1318, 1320 (5th Cir. 1971) ("requiring a showing that the particular *division* charged with the infringements had a regular and established place of business present in the District" is "more than required by the venue statute").

---

[4] In a footnote, Cray off-handedly dismisses Testa's importance to the venue determination, noting that his employment with Cray pre-dated this lawsuit and that he purportedly "had no roles or responsibilities that involved the accused products."  Pet. Br. 4 n.1.  What Cray ignores is that Testa's home office, and the activities conducted therein, are precisely the type of facts that support a "permanent and continuous presence" sufficient for venue to lie as explained by this Court in *Cordis*.  *Cordis*, 737 F.2d at 737.

Cray also asserts that Harless was unable to make sales or offers for sale of HPCs from his home. Pet. Br. 5. That assertion is belied by the district court's specific finding that Harless made offers for sale on behalf of Cray from his home office. Appx68 ("Mr. Harless had made multiple 'offers to sell' within the Eastern District of Texas while working for Cray."). That assertion is likewise belied by Cray's own documents, which demonstrate that Harless had authority to prepare and send price quotations and proposals to customers, listing himself as the account executive. Appx505-506 (¶¶ 6-7); Appx571-575.

Cray weakly attempts to characterize Harless' activities as "doing business" in the Eastern District as opposed to having a "regular and established place of business," improperly parsing various pieces of evidence as supporting the former but not the latter. Pet. Br. 19-21. In this case, such a distinction is without a difference. The evidence set forth above, including Harless' activities relied upon by the district court, amply demonstrate that while Harless was undeniably doing business on behalf of Cray in the Eastern District, his activities also establish that Cray had a regular and established place of business there.

Cray lastly argues that "the district court's expansive interpretation cannot be justified because of the 'modern era,'" citing to the four-factor test portion of the district court's opinion. Pet. Br. 22 (citing Appx76, Appx78-79). Even assuming that Cray's argument has merit, which it does not, the four-factor test

portion of the district court's decision was advisory in nature, and this Court

therefore has no jurisdiction to review it.  *See* Section VI, *infra*.

## V. While Neither The Plain Language Of § 1400(b) Nor This Court's *Cordis* Decision Requires That The "Place Of Business" Be A "Physical Location," A Home Office Is Plainly A Physical Location

Relying principally on Webster's dictionary, amicus Gilead argues that the

word "physical" should be read into "regular and established place of business" in

§ 1400(b), asserting that the word "place" is tantamount to a "physical location."

Gilead Br. 2-10.  Gilead accuses this Court in *Cordis*, the district court, and

countless other courts of either failing to interpret the term "place" or reading that

term out of the statute altogether by not requiring it to mean a "physical location."

Gilead Br. 5, 7; *see* Pet. Br. 21.  Amicus High Tech Inventors Alliance ("HTIA")

takes this argument to an extreme, asserting that home offices, which it

pejoratively characterizes as "the home of a telecommuting employee,"[5] can ***never***

constitute a "regular and established place of business," and that ideally a

company's headquarter should satisfy that role.  HTIA Br. 4-13.[6]  While neither the

---

[5] To be clear, this case is not merely about two telecommuters who happen to reside in the Eastern District.  Rather, this case involves two Cray salespeople, Harless and Testa, each of whom worked exclusively for Cray out of home offices in the Eastern District, and who together generated sales of more than $345 million.

[6] HTIA cursorily argues that an employee's home office is not "regular" in that an employee's "home is primarily a place in which one lives, and only secondarily a place in which one may work."  HTIA Br. 5-6.  HTIA also argues

plain language of § 1400(b) nor this Court's reasoning in *Cordis* requires a "physical location" for showing a "regular and established place of business," Harless' and Testa's home offices obviously do constitute "physical locations."

Turning first to the statute, its plain language contains no "physical location" requirement, and "physical location" should not be read into it. Under well-established Supreme Court statutory interpretation precedent, courts "ordinarily resist reading words or elements into a statute that do not appear on its face." *Dean v. United States*, 556 U.S. 568, 572 (2009) (quoting *Bates v. United States*, 522 U.S. 23, 29 (1997)); *see 62 Cases, More or Less, Each Containing Six Jars of Jam v. United States*, 340 U.S. 593, 596 (1951) ("But our problem is to construe what Congress has written. After all, Congress expresses its purpose by words. It is for us to ascertain—***neither to add nor to subtract***, neither to delete nor to distort.") (emphasis added). Here, the word "physical" appears ***nowhere*** on the face of § 1400(b), and that term should therefore not be read into that statute. Moreover, Congress has known when to add the word "physical" before "place of business"

---

that an employee's home office is not "established" by the employer, i.e., it is not "permanent." HTIA Br. 4-5. Suffice it to say that Harless' and Testa's home offices, which together generated over $345 million in revenue for Cray, ***must*** fall within HTIA's definition of "regular" for that definition to mean anything. As for "established," those home offices were no less permanent than any conventional store or office. Indeed, Harless already resided within the Eastern District when he was hired by Cray and then maintained his home office there on behalf of Cray for over seven years. Appx365 (¶ 6).

in other statutory contexts when it believed that term was necessary to convey its intent.  *See* 42 U.S.C. § 1320d-5(d)(6)(B) ("[P]rocess may be served in any district in which the defendant—(i) is an inhabitant; or (ii) maintains a ***physical place of business***."); 15 U.S.C. § 7706(f)(7)(B) ("[P]rocess may be served in any district in which the defendant—(i) is an inhabitant; or (ii) maintains a ***physical place of business***.").

In support of its statutory interpretation, Gilead cites to the legislative history of § 1400(b)'s predecessor (the Act of 1897), arguing that it bolsters Gilead's position that Congress sought "to narrow venue for patent cases."  Gilead Br. 8.  This argument is unavailing for at least two reasons.  First, the legislative history provides no support whatsoever for its position that the word "physical" should be read into the statue.  Indeed, the word "physical" appears nowhere in the legislative history of the Act of 1897.

Second, the legislative history is equivocal as to whether the "regular and established place of business" language in § 1400(b) is narrowing in character.  In contrast to the remarks of Mr. Mitchell cited by Gilead, both Messieurs Mitchell and Lacey provided remarks supporting the proposition that this language could be interpreted broadly. 29 Cong. Rec. 1900, 54th Cong., 2d Sess. (1897) (Mr. Mitchell reading the Committee on Patents report that the bill "further ***facilitates*** the bringing of suits in the place of business of the parties interested.  It is in the

24

interest of all and against the interest of none.") (emphasis added); *id.* at 1902 (Mr. Lacey noting, "There is no reason why as ***broad*** a jurisdiction should not be had in cases of patents, if infringers open up a permanent place of business—commence their business at that place.") (emphasis added).  As such, the legislative history provides little clarity as to whether the language "regular and established place of business" is broadening or narrowing in nature.

Moreover, the proposed "physical location" requirement, and HTIA's categorical contention that a home office can never constitute a "regular and established place of business," are inconsistent with *Cordis* and the realities of the modern business world.  *Cordis* specifically rejected that "a fixed physical presence in the sense of a formal office or store" is required to establish a "regular and established place of business."  *Cordis*, 769 F.2d at 737.  Instead, while eschewing the idea that a "physical location" (as contemplated by Cray and amici) is necessary in today's business world, this Court concluded that "the appropriate inquiry is whether the corporate defendant does its business in that district through a permanent and continuous presence there."  *Id.*  Following that reasoning, this Court held that the two home offices of Cordis' salespeople, coupled with the activities conducted from those offices, satisfied the "permanent and continuous presence" requirement.  *Id.*  Likewise, the district court here correctly found that

Harless' home office, and the activities conducted from that office, satisfied that same requirement. Appx73-75.

Lastly, even if the term "physical location" is read into the statute, it cannot seriously be argued that Harless' and Testa's home offices were not "physical locations" by any reasonable definition of the term. There is no dispute that those home offices were tangible, concrete places located within the Eastern District. There is also no dispute that Harless and Testa were Cray employees authorized by Cray to work out of those offices. And there is no dispute that the two employees together generated over $345 million revenue selling Cray products while working out of those offices. Thus, even if this Court were to agree with Cray and amici that § 1400(b) requires a "physical location," Harless' and Testa's home offices satisfy that requirement.

For all of these reasons, neither the plain language of § 1400(b) nor this Court's reasoning in *Cordis* requires a "physical location" to demonstrate a "regular and established place of business." Even if a physical location is required, Harless' and Testa's home offices satisfy that requirement.

## VI. This Case Is Not The Appropriate Vehicle To Address The Propriety Of The District Court's Four-Factor Venue Test, Which Is Advisory And Was Not Applied To The Facts Of This Case

Cray and amici invite this Court to vacate the district court's advisory guidance setting forth a four-factor test for analyzing "regular and established

place of business." Pet. Br. 22-24; Gilead Br. 10; HTIA Br. 14-17. This Court

should resist those invitations, because the advisory nature of that guidance

precludes this Court from reviewing it here. Article III courts are confined to

reviewing "cases" and "controversies," and advisory opinions do not fall within

either category. *In re Dien*, 680 F.2d 151, 155 (C.C.P.A. 1982); *see Arctic Corner,

Inc. v. United States*, 845 F.2d 999, 1001 n.2 (Fed. Cir. 1988) ("Advisory opinions

are not, of course, appealable to this court."); *see also In re Keil*, 808 F.2d 830, 830

(Fed. Cir. 1987) (dismissing appeal from an advisory decision of the Board of

Patent Appeals and Interferences for lack of jurisdiction). Indeed, as one of this

Court's predecessors quipped, "To review an advisory opinion would be to give

one." *Dien*, 680 F.2d at 155.

    In this case, the parties do not dispute that the district court's four-factor test

analysis was advisory in nature, with Cray appropriately characterizing it as

"advisory guidance." Pet. Br. 22, Heading IV (arguing "The Court Should Vacate

the District Court's ***Advisory Guidance*** Proposing a Four-Part Test For a 'Regular

and Established Place of Business'") (emphasis added); *see* HTIA Br. 1, 3

(characterizing the four-factor test as "advisory"). Indeed, the district court itself

acknowledged that it never applied its new test to the facts of this particular case,

noting instead that this case was resolved based on *Cordis* alone. Appx84 n.13

(stating that "the Court declines to expressly apply the factors above in this particular case"); *id* ("*Cordis* is alone adequate to support the result herein.").

Accordingly, this Court should decline Cray's and amici's invitations to review the advisory portion of the district court's opinion regarding its four-factor test and instead limit its review to the district court's venue analysis under *Cordis*.

## VII. If This Court Were To Grant Cray's Petition, It Should Remand To The District Court For Further Venue-Related Proceedings

Because the district court concluded that venue was proper in the Eastern District, it made no findings or conducted any hearings regarding an alternate venue. As such, if this Court were to grant Cray's petition, the Court should remand to the district court for further proceedings to determine the proper venue to which this case should be transferred pursuant to 28 U.S.C. § 1406(a).

If this Court were to grant Cray's petition without remand, it should direct the district court to transfer the case to the nearby Western District of Texas. Both parties have a substantial presence there, the majority of Raytheon's witnesses live nearby, and most of the non-party witnesses live closer to the Western District of Texas than to the Western District of Wisconsin.

Raytheon has locations in Austin, El Paso, San Antonio, and Killeen in the Western District of Texas, and its nearby business unit in Richardson is responsible for the innovations disclosed in the patents-in-suit. Moreover, the majority of Raytheon's employee-witnesses (six out of nine) live in Texas and only a few

hours' drive from the Western District of Texas.  Appx509-511 (¶¶ 12-13).  Cray too has a substantial presence in the Western District of Texas.  Cray boasts "an R&D group in [A]ustin working on board engineering, ASIC design, system engineering, firmware development and design verification." Appx512 (¶ 14); Appx419.  As for Cray's employee witnesses, neither jurisdiction is more convenient for the half of them (five out of eleven) who are nearly equidistant from either district.  Appx509-511 (¶¶ 12-13).

Significantly, the convenience for non-party witnesses weighs heavily in favor of the Western District of Texas.  The Western District of Texas is closer for six of the non-party witnesses, whereas the Western District of Wisconsin is closer for only three.  *Id.*

For these reasons, the Western District of Texas is the next-most convenient venue.

## CONCLUSION

For the foregoing reasons, this Court should deny Cray's petition for writ of mandamus.

Dated:  August 1, 2017                    Respectfully submitted,

                                          /s/ *John Josef Molenda*
                                          John Josef Molenda
                                          STEPTOE & JOHNSON LLP
                                          1114 Avenue of the Americas, 35th Floor
                                          New York, NY 10036

29

Phone:  (212) 506-3900

Thomas J. Filarski
Daniel S. Stringfield
STEPTOE & JOHNSON LLP
115 S. LaSalle St., Suite 3100
Chicago, IL 60603
Phone:  (312) 577-1300

Christopher M. Re
Fang Bu
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, NW
Washington DC 20036
Phone:  (202) 429-3000

*Counsel for Respondent Raytheon Company*

# APPENDIX

# TABLE OF CONTENTS

| File Date | Docket No. | Description | Appx. No. |
|---|---|---|---|
| 12/11/15 | 22 | Raytheon's Opposition to Cray's Motion to Dismiss or Transfer | Appx576 |
| 12/11/15 | 22-37 | Stringfield Declaration, Exhibit 36—Cray News Release titled "Cray Inc. Reports Third Quarter 2011 Financial Results" | Appx597 |
| 7/13/16 | 69-2 | Declaration of Bryan A. Kohm in Support of Cray Inc.'s Objection to Report and Recommendation, Exhibit A—Invoice submitted into evidence by Cray during an evidentiary hearing held on June 15, 2016 | Appx622 |

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

RAYTHEON COMPANY,

     *Plaintiff*,

vs.

     Civil Action No. 2:15-CV-1554-JRG-RSP

      JURY TRIAL DEMANDED

CRAY, INC.,

     *Defendant*

---

## PLAINTIFF RAYTHEON COMPANY'S OPPOSITION
## TO CRAY INC.'S MOTION TO DISMISS OR TRANSFER

# TABLE OF CONTENTS

I.    INTRODUCTION ..................................................................................................... 1

II.   BACKGROUND ...................................................................................................... 2

    A.   The Parties ..................................................................................................... 2

    B.   Raytheon's Attempt to Form a Business Relationship with Cray ..................... 3

    C.   Cray's Preemptive Suit Against Raytheon .................................................... 4

    D.   Raytheon Has Twice Moved to Dismiss Cray's Washington Case ..................... 5

    E.   Raytheon's Infringement Suit Against Cray in this Judicial District ................... 6

    F.   Crays' Infringement within this Judicial District.................................................. 7

        1.   Cray's Direct Patent Infringement within this Judicial District................. 7

        2.   Cray's Indirect Patent Infringement within this Judicial District.............. 9

III.  LEGAL STANDARD............................................................................................... 10

IV.   ARGUMENT ............................................................................................................ 11

    A.   Venue is Appropriate Under 28 U.S.C. § 1400 (b).............................................. 11

        1.   Cray "Has Committed Acts of Infringement and Has a Regular and
            Established Place of Business" in the Eastern District of Texas ............. 11

        2.   Alternatively, Cray Resides in the Eastern District of Texas ................... 12

    B.   Venue is Appropriate Under 28 U.S.C. § 1391 .................................................. 14

    C.   The "First to File" Rule Does Not Mandate Dismissal or Transfer...................... 14

V.    CONCLUSION......................................................................................................... 15

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*3rd Eye Surveillance, LLC v. Town of Addison*,
   Case No. 6:14-CV-536-JDL, 2015 U.S. Dist. LEXIS 6264 (E.D. Tex. Jan. 20, 2015)...........10

*Abstrax, Inc. v. Hewlett-Packard Co.*,
   No. 2:14-cv-158-JRG, 2014 U.S. Dist. LEXIS 155805 (E.D. Tex. Nov. 3, 2014) ...................9

*Action Embroidery Corp. v. Atl. Embroidery, Inc.*,
   368 F.3d 1174 (9th Cir. 2004) .................................................................................................5

*Burger King Corp. v. Rudzewicz*,
   471 U.S. 462 (1985)...................................................................................................11, 13

*Centillion Data Sys., LLC v. Qwest Communs. Int'l*,
   631 F.3d 1279 (Fed. Cir. 2011)..............................................................................................12

*Corbello v. DeVito*,
   No. 07-cv-985, 2008 U.S. Dist. LEXIS 40336 (E.D. Tex. May 19, 2008)...............................8

*Cray v. Raytheon Company*,
   Case No. 15-cv-01127 JLR..............................................................................................1

*Elecs. for Imaging, Inc. v. Coyle*,
   340 F.3d 1344 (Fed. Cir. 2003)..............................................................................................13

*EMC Corp. v. Norand Corp.*,
   89 F.3d 807 (Fed. Cir. 1996)..................................................................................................15

*Global-Tech Appliances, Inc. v. SEB S.A.*,
   131 S. Ct. 2060 (2011)............................................................................................................12

*Helicopteros Nacionales de Colombia, S.A. v. Hall*,
   466 U.S. 408 (1984)................................................................................................................11

*Inamed Corp. v. Kuzmak*,
   249 F.3d 1356 (Fed. Cir. 2001)..............................................................................................11

*International Shoe Co. v. Washington*,
   326 U.S. 310 (1945)................................................................................................................11

*Invensense, Inc. v. STMicroelectronics, Inc.*,
   No. 2:13-CV-00405-JRG, 2014 U.S. Dist. LEXIS 3311 (E.D. Tex. Jan. 10, 2014) .........10, 11

ii

*LSI Indus. v. Hubbell Lighting, Inc.*,
  232 F.3d 1369 (Fed. Cir. 2000)...................................................................11, 12, 13

*MGT Gaming, Inc. v. WMS Gaming, Inc.*,
  978 F. Supp. 2d 647 (S.D. Miss. 2013)...................................................................12

*Mission Ins. Co. v. Puritan Fashions Corp.*,
  706 F.2d 599 (5th Cir. 1983) ...................................................................15

*Radio Sys. Corp. v. Accession, Inc.*,
  638 F.3d 785 (Fed. Cir. 2011)...................................................................6

*Raytheon Co. v. Sony Kabushiki Kaisha, et al.*,
  Case No. 15-cv-00342-JRG-RSP, Dkt. 31 at 14-15 (E.D. Tex. Aug. 28, 2015) ...................3

*Valadez-Lopez v. Chertoff*,
  656 F.3d 851 (9th Cir. Cal. 2011)...................................................................14

*VE Holding Corp. v. Johnson Gas Appliance Co.*,
  917 F.2d 1574 (Fed. Cir. 1990)...................................................................10, 12, 14

**STATUTES**

28 U.S.C. § 1391...................................................................1, 10, 14

28 U.S.C. § 1391(c)...................................................................10, 12, 14

28 U.S.C. § 1391(d)...................................................................10, 12

28 U.S.C. § 1400(b)................................................................... passim

35 U.S.C. § 271 (b)...................................................................1, 12

**RULES**

Federal Rule of Evidence 408...................................................................4

Federal Rule of Civil Procedure 12(b)(3) ...................................................................8

iii

## I.     INTRODUCTION

Defendant Cray Inc.'s ("Cray") motion to dismiss or transfer this case to the Western District of Washington should be denied.

Venue in this District is proper under 28 U.S.C. §§ 1391 and 1400 (b).  Cray has admitted that it has at least one sales agent residing within this District, and many more throughout Texas. (Dkt. 21, "Cray Mot.," at 4.)  These sales agents, including the agent within this District, have committed, and continue to commit, acts of patent infringement on behalf of Cray, specifically the acts of selling or offering to sell infringing Cray systems and products, from within this District and from within the State of Texas. (*See* Dkt. 1, "Compl.," at ¶ 6.)  These Cray acts of direct infringement alone are sufficient to establish that venue is appropriate in this District.

Moreover, as Plaintiff Raytheon Company ("Raytheon") asserted in its Complaint, and as Cray has admitted, at least one accused Cray XC40 system is used by the University of Texas. (*See* Compl. at ¶ 7; Cray Mot. at 4.)   This Cray system may be accessed via remote terminals at various university facilities, including at facilities located within this District. (*See* Compl. at ¶ 7.)  Users of this system within this District directly infringe one or more of the asserted patents. (*See, e.g., id.* at ¶¶ 23, 39.)  With knowledge of the asserted patents and their applicability to the accused system, Cray is responsible for inducing their infringement—within this District— pursuant to 35 U.S.C. § 271 (b).  (*Id.*)  Thus, Cray's acts of indirect infringement within this Judicial District also render venue proper.

Cray's alternative argument that this Court must yield to Cray's suit in the Western District of Washington[1] under the "first-to-file" rule is without merit.  As Raytheon has now twice demonstrated in motions submitted before the Washington Court, Cray's July 15, 2015

---

[1] *Cray v. Raytheon Company*, Case No. 15-cv-01127 JLR, in the U.S. District Court for the Western District of Washington at Seattle (hereinafter, the "Washington case").

complaint in that case was jurisdictionally deficient and thus, a nullity.  Because the Western District of Washington lacks personal jurisdiction over Raytheon, there was never a valid complaint against Raytheon there.  Therefore, the instant case was the first—and only—proper suit addressing Cray's infringement, as well as any subsidiary defenses Cray may raise.

Finally, Cray's "first-to-file" argument depends on its Washington case going forward. Raytheon has moved to dismiss that case and briefing on that motion will close on December 18. If the Court decides to hold its decision on Cray's motion in abeyance pending the Washington Court's decision, Raytheon respectfully submits that this case should otherwise go forward.  The parties have already begun exchanging their contentions here pursuant to the Patent Rules and those efforts, which will be equally useful in either Court, should be permitted to proceed.

## II.    BACKGROUND

### A.    The Parties

Raytheon is a technology and innovation leader specializing in defense, civil government and cybersecurity markets throughout the world.  Raytheon was also a leader in the high-performance computing ("HPC") field, investing substantial resources and capital into developing pioneering HPC innovations which have been awarded numerous U.S. and foreign patents, including the four patents-in-suit: United States Patent Nos. 7,475,274 ("the '274 Patent"), 8,190,714 ("the '714 Patent"), 8,335,909 ("the '909 Patent") and 9,037,833 ("the '833 Patent").  No longer actively engaged in the HPC market, Raytheon has elected to make its HPC technology available to the industry through alliances with HPC manufacturers, such as Cray.

Raytheon, along with its Richardson-located Intelligence, Information and Services ("IIS") business unit responsible for the patents-in-suit, is a *bona fide* resident of this Judicial District and State, employing almost 8,000 Texans and contributing almost $1B to the Texas economy. *Cf. Raytheon Co. v. Sony Kabushiki Kaisha, et al.*, Case No. 15-cv-00342-JRG-RSP,

2

Dkt. 31 at 14-15 (E.D. Tex. Aug. 28, 2015) (referring to Raytheon's McKinney-located Space and Airborne Systems division responsible for Raytheon's microelectronic device litigation).

According to its motion, Cray is a Washington corporation with its principal place of business in Seattle, Washington. (Cray Mot. at 2.) Besides its Seattle location, "Cray offices include Chippewa Falls, Wisconsin; St. Paul, Minnesota; Austin, Texas; Houston, Texas; Vancouver, British Columbia; Ottawa, Ontario; and Silicon Valley, California." (*Id.* at 4.)

### B.    Raytheon's Attempt to Form a Business Relationship with Cray

As mentioned above, Raytheon had elected to make its HPC technology available to Cray. Thus, Raytheon engaged a Dallas-based patent-licensing firm, International Patent Licensing Co., LLC ("IPLC"), which sent Cray a March 20, 2015 letter and claim charts identifying certain Raytheon HPC patents. (Decl. of Daniel S. Stringfield, "Stringfield Decl.," at ¶¶ 2-3.) The purpose of this letter was to "negotiat[e] a patent license agreement with Cray that will be fair to both parties and will enable Cray to derive important business benefits, including continued use of Raytheon's patented technology." (*Id.* at ¶ 2.)

IPLC sent a follow-up letter on May 12, 2015, providing additional detail and claim charts regarding the '714 Patent. (*Id.* at ¶¶ 4-5.) This letter also stated, "Raytheon and IPLC continue to believe in the importance of a licensing discussion with Cray that should produce an agreement fair to both parties and enable Cray to derive important business benefits, including continued use of Raytheon's patented technology." (*Id.* at ¶ 4.)

On May 13, 2015, Cray's Associate General Counsel, Michael F. Fleming (who is also Cray's corporate declarant in support of the instant Motion), sent a letter accepting IPLC's "invitation to discuss and understand [Raytheon's] business proposals respecting Cray's business and the patents referenced in your March 20 letters." (*Id.* at ¶ 6.) Though Mr. Fleming is based in St. Paul, Minnesota, and IPLC is based in Dallas, Texas, Mr. Fleming suggested a meeting in

3

Seattle. (*See id.*)  Mr. Fleming also copied David Tellekson, the Seattle lawyer who would file the Washington case just two months later. (*See id.* at ¶¶ 6-7.)

On June 18, 2015, Raytheon and Cray met at Mr. Tellekson's Seattle offices. (*Id.* at ¶¶ 8-10.)  Cray was represented by Cray in-house attorney Fleming and two lawyers from Fenwick & West, Mr. Tellekson from Seattle and Bryan Kohm from San Francisco. (*Id.*)  Messrs. Tellekson and Kohm are counsel for Cray in both the Washington case and this action. (*Id.* at ¶ 7.)

During the meeting, Raytheon made presentations demonstrating Cray's need for a license to certain Raytheon HPC patents. (*Id.* at ¶¶ 9-10.)  The presentations also included potential terms for a license. (*Id.* at ¶ 10.)  Each of the presentations was marked for the purpose of "License Discussion" and included a designation under Federal Rule of Evidence 408. (*Id.*)

After the June 18 meeting, IPLC sent three follow-up communications. (*Id.* at ¶¶ 9-14.)  Similar to the pre-meeting communications, IPLC stated "Raytheon and IPLC continue to believe in the importance of licensing discussions with Cray that should produce an agreement fair to both parties and enable Cray to derive important business benefits, including continued use of Raytheon's patented technology. We look forward to future discussions with you and resolving this situation in a manner that satisfies Cray and Raytheon." (*Id.* at ¶ 11)

### C.  Cray's Preemptive Suit Against Raytheon

Notwithstanding the negotiation purposes of the above-described meeting and communications, Cray filed the Washington case on July 15, 2015. (*See id.* at ¶ 7.)

Two days later, Mr. Tellekson sent an email to Mr. Neuenschwander informing him that Cray had filed the Washington case. (*Id.* at ¶ 15.)  Mr. Tellekson also indicated that Cray was preparing *inter partes* review petitions and that such petitions "would impair Raytheon's ability to license the portfolio to other parties." (*Id.*)  Mr. Tellekson also indicated that "[i]f Raytheon

4

would like to avoid this result, Cray is willing to meet with Raytheon to explain the errors in Raytheon's analysis, both validity and infringement, before Cray files the [petitions]." (*Id*.)

### D.    Raytheon Has Twice Moved to Dismiss Cray's Washington Case

Raytheon has moved twice to dismiss Cray's Washington case.  In Raytheon's first motion to dismiss, filed on September 25, 2015, the same day as Raytheon filed the instant suit in this Court, Raytheon demonstrated that Cray could not meet its burden to establish either general or specific personal jurisdiction over Raytheon for the nine (9) non-infringement declaratory judgment ("DJ") counts asserted in Cray's original complaint.  (*Id*. at ¶ 17.)

Rather than respond to that motion, Cray filed an amended complaint on October 16, 2015 wherein Cray dropped five (5) of its original DJ counts, leaving only four (4), identically re-pled, non-infringement DJ counts (each related to one of the four patents at issue in the instant case).  (*Id*. at ¶ 18.)  Cray added nine (9) new counts consisting of defenses typically pled by accused infringers as counterclaims or affirmative defenses in patent suits.  (*Id*. at ¶ 18.)  Cray's amended complaint also dropped its prior assertion of general personal jurisdiction.  (*Id*.)

Raytheon moved to dismiss Cray's amended complaint on November 25, 2015.  (*Id*. at ¶ 19.)  In its motion, Raytheon demonstrated that Cray had not, and could not, meet its burden of demonstrating that the Washington Court had personal jurisdiction over Raytheon for each and every one of the thirteen (13) counts alleged in Cray's amended complaint.[2]  (*Id*. at ¶ 19.)

First, Raytheon demonstrated that Cray did nothing to cure the jurisdiction deficiencies Raytheon identified in its original motion as to the four (4) identically re-pled non-infringement DJ counts.  (*Id*. at ¶ 20.)  In both its original and amended complaints, Cray asserted jurisdiction over these four counts based on licensing-negotiation communications sent to, and a single

---

[2] Specific personal jurisdiction is evaluated on a claim-by-claim basis. *See Action Embroidery Corp. v. Atl. Embroidery, Inc.*, 368 F.3d 1174, 1180 (9th Cir. 2004) ("Personal jurisdiction must exist for each claim asserted against a defendant.").

meeting held within, Washington. (*Id.*) However, as Raytheon demonstrated in both of its motions to dismiss, the Federal Circuit has held exactly these types of contacts to be insufficient for the purpose of creating specific personal jurisdiction.[3] (*Id.*)

Second, regarding the nine (9) new counts in Cray's amended complaint, Raytheon demonstrated that because the events alleged in support of these counts all occurred outside of Washington (indeed, some allegedly occurred in Texas), and none were "purposefully directed" to Washington residents, there was no specific personal jurisdiction over Raytheon for these counts. (*Id.* at ¶ 21.) Alternatively, Raytheon demonstrated that these nine (9), infringement-defense counts should be dismissed under the "fair play and substantial justice" prong of the due process inquiry because Cray's failure to *ab initio* demonstrate jurisdiction over the non-infringement DJ counts renders this action in this Court the first, and only, proper action addressing Cray's infringement of the four patents-in-suit. (*Id.* at ¶ 21.)

Cray's opposition to Raytheon's second motion to dismiss is due on December 11, 2015 and briefing will close on December 18, 2015. (*Id.* at ¶ 22.)

**E.    Raytheon's Infringement Suit Against Cray in this Judicial District**

Raytheon filed this suit on September 25, 2015. Raytheon accuses Cray of infringing four patents related to HPC technology: the '274 Patent relates generally to HPC fault tolerance and recovery systems and methods; the '714 Patent relates generally to HPC cluster virtualization systems and methods; the '909 Patent relates generally to HPC processor coupling systems and methods; and the '833 Patent relates generally to HPC interconnected computing notes systems and methods. (*See* Compl. at ¶¶ 11, 19, 27 and 35.)

---

[3] *See, e.g., Radio Sys. Corp. v. Accession, Inc.*, 638 F.3d 785, 789 (Fed. Cir. 2011) ("[O]rdinary cease-and-desist notices sent by a patentee to an alleged infringing party in a different state are not sufficient to subject the patentee to specific jurisdiction in that state."); *see also id.* (finding licensing meeting in forum state insufficient to establish specific jurisdiction).

On November 24, 2015, pursuant to Eastern District of Texas Local Patent Rule ("P.R.") 3-1, Raytheon served Cray with detailed infringement contentions mapping Cray's XC, XE, XK, CS, and URIKA-XA products against 70 claims of the four patents-in-suit. (*See* Dkt. 18.)  With charts and annexes, these contentions totaled over 1,000 pages.  On that same day, pursuant to P.R. 3-2, Raytheon served over 30,000 pages of documents. (*See id.*)

As set forth in Raytheon's P.R. 3-1 Contentions, Raytheon accuses various Cray systems of infringing multiple claims of the four patents-in-suit.  As an example, Raytheon accuses the Cray "XC Family" of systems, which includes the XC40 installed at the University of Texas (*see* Cray Mot. at 4), of infringing at least: claims 1-8, 11-24, 27-35, and 38 of the '274 Patent; claims 1, 2 4-6, 9, 11-14, 29, 30, 32, 33, 37, and 39-42 of the '714 Patent; claims 1, 4, 9, 11, 14-15, 18, 23-24, and 27 of the '909 Patent; and claims 1-4, 8-11, and 14-15 of the '833 Patent. (*See* Stringfield Decl. at ¶ 23.)  These asserted claims include system and method claims. (*Id.*)

The parties appeared before the Court on December 8, 2015 for a scheduling conference. At this conference, the Court set claim construction for August 4, 2016 and set trial for March 6, 2017. (*Id.* at ¶ 24.)  On or before January 19, 2016, Cray is required to prepare and serve upon Raytheon any invalidity contentions it may have against the Raytheon patents pursuant to P.R. 3-3, and document production describing its accused products pursuant to P.R. 3-4. (*Id.*)

### F. Crays' Infringement within this Judicial District

### 1. Cray's Direct Patent Infringement within this Judicial District

As Raytheon alleged in its Complaint and as Cray acknowledges, Cray has a sales agent within this Judicial District. (*See* Compl. at ¶ 6; Cray Mot. at 4.)  This agent, Mr. Douglass Harless, lives within Athens, Texas and has the title, Sales Executive. (*See id.*; *see also* Stringfield Decl. at ¶ 25.)  Mr. Harless is "[r]esponsible for new sales and new account development in [the] Central U.S. and [has] additional responsibilities of management of key

7

accounts within [the] Financial, BioMedical and Petroleum Industries." (*Id.*) He is also "responsible within Cray for most new petroleum industry development within the USA" and he "currently [has] national account responsibility for 6 major accounts within USA." (*Id.*)

Cray represents that its only Texas offices are in Austin and Houston. (Cray Mot. at 4.) Insofar as Athens is a 3 to 3-1/2 hour drive from either of these offices, Mr. Harless is apparently a home-based sales employee. (*See* Stringfield Decl. at ¶ 26.) Thus, based on his above-listed job responsibilities for Cray, Mr. Harless sells or offers to sell infringing Cray systems from within this District.[4] (*See id.*) Mr. Harless' offers to sell and sales of infringing Cray systems, as an agent of Cray, constitute acts of direct patent infringement within this District by Cray.[5]

Cray tacitly admits the foregoing, attempting to sidestep Raytheon's allegation that Cray's employees—including Mr. Harless within this Judicial District—offer to sell and do sell accused supercomputer systems from within this District. (*See* Compl. at ¶ 6.) Surely if Mr. Harless conducted his sales activities from outside of this District, Cray would have so argued. Instead, Cray argues "Cray played no part in Mr. Harless's election to select Athens as his home, and certainly did not direct Mr. Harless to live there or anywhere else in the Eastern District of

---

[4] Mr. Harless explains in his online resume that he is "responsible within Cray for most new petroleum industry development within the USA" and he has been responsible—within Athens, Texas—for "management of key accounts within [the] Petroleum Industr[y]" since May 2008. (Stringfield Decl. at ¶ 26.) One such petroleum industry system is a Cray XE6 System that Cray sold to ExxonMobil in August, 2011. (*See id.* at ¶ 27.) The Cray XE6 system is accused of infringing multiple claims of all four of the patents-in-suit. (*See id.* at ¶ 23.) Thus, Mr. Harless' involvement in the sale or offer for sale of this accused system is an act of infringement from within this Judicial District.

[5] Raytheon need not prove Cray's liability for infringement at the pleading stage to defeat Cray's motion to dismiss. For now, Raytheon has shown how the allegations in its well-pleaded complaint, taken as true, demonstrate that venue in this Court is appropriate. *See Corbello v. DeVito*, No. 07-cv-985, 2008 U.S. Dist. LEXIS 40336, at *6 (E.D. Tex. May 19, 2008) (when considering a Rule 12(b)(3) motion to dismiss for improper venue, the "court will accept those [facts establishing proper venue] in Plaintiff's pleadings to be true, and resolve any conflicts in favor of Plaintiff").

Texas." (Cray Mot. at 12.)  Cray makes several, carefully-worded, representations that neither Cray nor Mr. Harless make sales or offers for sale <u>into</u> the Eastern District of Texas. (*See id.* at 11 ("[Mr. Harless'] activities are directed to entities outside of the Eastern District.  All accounts reside elsewhere.").)  Significantly, and perhaps fatally to its Motion, Cray says nothing about sales or offers for sale originating <u>from within</u> this District. *See Abstrax, Inc. v. Hewlett-Packard Co.*, No. 2:14-cv-158-JRG, 2014 U.S. Dist. LEXIS 155805, *7 (E.D. Tex. Nov. 3, 2014) ("The Court relies on [movants] to accurately disclos[e] the facts underlying the motions they file. . . . An incomplete recitation of those facts may be just as misleading as an inaccurate recitation. This means that the [movant] must perform a thorough investigation of the facts underlying the venue analysis, ***before filing the motion***.") (emphasis in original).

### 2. Cray's Indirect Patent Infringement within this Judicial District

Cray admits that it sold an accused XC40 system to the University of Texas. (*See* Cray Mot. at 4.)  Raytheon alleges in its complaint that this accused system may be accessed via remote terminals at various University of Texas facilities, including at facilities within this Judicial District. (*See* Compl. at ¶ 7.)

Tellingly, Cray does not deny this fact.  Rather, Cray attempts to deflect, asserting that it did not "sell or ship 'terminals' to the University of Texas, Tyler." (Cray Mot. at 4.)  Cray also cryptically asserts that "[t]he fact that Cray sold systems to the University of Texas, Austin, which in turn may (or may not) allow residents in the Eastern District to utilize the systems located in Austin, is immaterial" in the context of the general personal jurisdiction analysis. (*Id.* at 9; *see also id.* at 11 ("Whether or not TACC at the University of Texas, Austin makes available terminals in the Eastern District is irrelevant to the specific jurisdiction analysis.").  Through these cryptic and carefully-crafted statements—and through its notable failure to outright deny Raytheon's allegations—Cray tacitly acknowledges that at least the University of

9

Appx588

Texas' accused XC40 system may, in fact, be accessed within this Judicial District, supporting Raytheon's allegations of indirect infringement by Cray. (*See* Compl. at ¶¶ 23, 39.)

## III. LEGAL STANDARD

In patent cases, venue is proper "in the judicial district where the defendant resides, or where the defendant has committed acts of infringement and has a regular and established place of business." 28 U.S.C. § 1400(b). A corporate defendant is deemed to reside "in any judicial district in which such defendant is subject to the court's personal jurisdiction." 28 U.S.C. § 1391(c); *see also VE Holding Corp. v. Johnson Gas Appliance Co.*, 917 F.2d 1574, 1584 (Fed. Cir. 1990).[6] "[W]ith respect to corporate defendants (but not individuals), the 'acts of infringement plus' test is effectively surplusage." *Invensense, Inc. v. STMicroelectronics, Inc.*, No. 2:13-CV-00405-JRG, 2014 U.S. Dist. LEXIS 3311, at *7 (E.D. Tex. Jan. 10, 2014) (citing *VE Holding*, 917 F.2d at 1580 n.17). In a state with multiple judicial districts, such as Texas, a corporate defendant is "deemed to reside in any district in that State within which its contacts would be sufficient to subject it to personal jurisdiction if that district were a separate State [or] in the district within which it has the most significant contacts." 28 U.S.C. § 1391(d). In states such as Texas, "where the forum's long-arm statute is coextensive with the limits of constitutional due process, personal jurisdiction exists where a defendant has 'certain minimum contacts with [the jurisdiction] such that the maintenance of the suit does not offend 'traditional

---

[6] Citing no case law, Cray asserts that the *VE Holding* decision was abrogated by a 2011 amendment to Section 1391. (Cray Opp. at 7-8.) However, no courts agree with Cray's unsupported assertion. From 2012 (after said amendment) until the present, the *VE Holding* decision has been cited in approximately 63 decisions reported in the Lexis Advance online research system (and untold more unreported decisions). (*See* Stringfield Decl. at ¶ 28.) The *VE Holding* decision has been cited at least 14 times since 2012 by Courts within the Eastern District of Texas, including at least as recently as January 20, 2015. *See, e.g.*, *3rd Eye Surveillance, LLC v. Town of Addison*, Case No. 6:14-CV-536-JDL, 2015 U.S. Dist. LEXIS 6264, at *3 (E.D. Tex. Jan. 20, 2015). None of these decisions have indicated that *VE Holding* is no longer good law. (Stringfield Decl. at ¶ 28.) The Court need not reach this question, however, as venue is appropriate under either or both of Sections 1391 and 1400. (*See infra.*, Sections IV.A.-B.)

notions of fair play and substantial justice.'"" *Invensense*, 2014 U.S. Dist. LEXIS 3311, at *7

(quoting *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). The minimum

contacts requirement is satisfied where a plaintiff shows that the defendant is subject to either

specific or general jurisdiction. *See Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S.

408, 414 (1984). "Specific jurisdiction 'arises out of' or 'relates to' the cause of action even if

those contacts are 'isolated and sporadic.'" *LSI Indus. v. Hubbell Lighting, Inc.*, 232 F.3d 1369,

1375 (Fed. Cir. 2000) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472-73 (1985)).

A court may exercise specific jurisdiction over a defendant when the defendant purposefully

directed its activities at residents of the forum state, the claim arises out of or relates to the

defendant's activities within the forum state, and the assertion of personal jurisdiction is

reasonable and fair. *Inamed Corp. v. Kuzmak*, 249 F.3d 1356, 1360 (Fed. Cir. 2001).

## IV. ARGUMENT

### A. Venue is Appropriate Under 28 U.S.C. § 1400 (b)

#### 1. Cray "Has Committed Acts of Infringement and Has a Regular and Established Place of Business" in the Eastern District of Texas

Because Cray "has committed acts of infringement and has a regular and established

place of business" in the Eastern District of Texas, venue is appropriate here. *See* 28 U.S.C. §

1400 (b). First, through its home-based sales agent, Cray has committed the infringing acts of

selling or offering to sell infringing systems from within this Judicial District. (*See supra*,

Section II.F.1.)

Though Cray did not "direct Mr. Harless to live [in Athens]," Mr. Harless, as Cray's

agent, has a regular and established place of business within this District—i.e., his home office.

(*See id.*; *see also* Stringfield Decl. at ¶¶ 25-26.) Unquestionably, Cray has been aware of, and

approved, Mr. Harless' home-based employment on behalf of Cray for the past seven-plus years.

11

(*See id.* (Mr. Harless holding himself out as an Athens-based "Sales Executive, Central US," for Cray, Inc. from May 2008 to present).) Indeed, Mr. Harless' activities based in Athens have made him "#1 in new account development over [the] past several years" for Cray. (*Id.*)

In addition to committing the above-described acts of direct infringement from within this District, Cray is responsible for indirect infringement related to the use of at least one accused XC40 system within this District. (*See supra*, Section II.F.2.) Insofar as both method and system claims are asserted against the XC40, (*see supra*, Section II.E), the use of this system—where users within this District control and obtain benefit from it—constitutes acts of direct infringement. *See Centillion Data Sys., LLC v. Qwest Communs. Int'l*, 631 F.3d 1279, 1284 (Fed. Cir. 2011). Moreover, insofar as Cray has had knowledge of the asserted patents and their applicability to its systems since at least March 20, 2015, (*see supra*, Section II.B), Cray is liable for these acts of infringement pursuant to 35 U.S.C. § 271 (b). *See Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S. Ct. 2060, 2068 (2011).

Thus, because Cray "has committed acts of infringement and has a regular and established place of business" in this District, venue is proper. *See* 28 U.S.C. § 1400 (b); *see also MGT Gaming, Inc. v. WMS Gaming, Inc.*, 978 F. Supp. 2d 647, 668 (S.D. Miss. 2013) (finding sales and distribution office within the judicial district sufficient to establish venue).

### 2. Alternatively, Cray Resides in the Eastern District of Texas

Alternatively, venue is appropriate because Cray resides in the Eastern District of Texas. *See* 28 U.S.C. § 1400 (b). Cray is deemed to "reside" in this District for "all venue purposes" because this Court has specific personal jurisdiction over Cray. *See* 28 U.S.C. § 1391 (c)-(d); *VE Holding*, 917 F.2d at 1584. Cray has had sufficient minimum contacts with this District that "arise from" or "relate to" Raytheon's infringement allegations against Cray to reside here. *See LSI Indus.*, 232 F.3d at 1375. For example, as described above, Cray's agent, Mr. Harless,

12

commits purposeful acts of infringement on behalf of Cray by selling infringing Cray systems from within this District. (*See supra*, Section IV.A.1.; *see also*, *supra*, Section II.F.1.) Cray also purposefully directs activities at residents of this District in furtherance of Mr. Harless' infringement on behalf of Cray, including, *inter alia*, sending compensation into this District to Mr. Harless for his work performed here.

As also described above, Cray is responsible for indirect infringement related to the infringing use of the accused XC40 system within this District. (*See supra*, Section IV.F.2.) Cray purposefully directed infringing activities at residents of this District when it made, offered for sale and/or sold the system and knew, or should have known, that the accused XC40 system was installed to be used at various University of Texas facilities, including facilities within this District. Cray further continues to direct infringing activities at residents of this District to the extent that Cray continues to provide ongoing administration, training, instruction, operation, service, support, updates or upgrades, etc. of the infringing University of Texas XC40 system.

Moreover, Cray has not presented a "compelling case" that this Court's exercise of specific personal jurisdiction over Cray would offend notions of fair play and substantial justice. *See Elecs. for Imaging, Inc. v. Coyle*, 340 F.3d 1344, 1351-52 (Fed. Cir. 2003) ("Once the plaintiff has shown that there are sufficient minimum contacts to satisfy due process, it becomes defendants' burden to present a 'compelling case that the presence of some other considerations would render jurisdiction unreasonable.'") (quoting *Burger King*, 471 U.S. at 477). Cray makes no specific "fair play" argument; rather, Cray merely repeats its "minimum contacts" arguments. (Cray Mot. at 11.) Nonetheless, based on Cray's contacts with this District, its purposeful acts within this District (via its agent, Mr. Harless) and its purposeful acts directed at this District, all as described above, Cray should have anticipated suit here.

Case 2:15-cv-0

Thus, because Cray resides in this District, venue is proper. *See* 28 U.S.C. § 1400 (b).

### B. Venue is Appropriate Under 28 U.S.C. § 1391

Under the general venue statute, venue is appropriate "in any judicial district in which such defendant is subject to the court's personal jurisdiction." *See* 28 U.S.C. § 1391(c); *VE Holding*, 917 F.2d at 1584. As explained in the previous section, this Court has at least specific personal jurisdiction over Cray because Cray has had sufficient minimum contacts with this District that "arise from" or "relate to" Raytheon's infringement allegations against Cray and exercise of that jurisdiction would not offend fair play and substantial justice. (*See supra*, Section IV.A.2.) Thus, venue is appropriate under 28 U.S.C. § 1391.

### C. The "First to File" Rule Does Not Mandate Dismissal or Transfer

Cray's alternative argument that this Court must yield to Cray's Washington suit under the "first-to-file" rule is without merit.

First, as explained above, the Washington case was jurisdictionally deficient as originally filed and thus, a nullity. (*See supra*, Section II.D.) Cray conceded as much when, instead of responding to Raytheon's first motion to dismiss, it filed an amended complaint that replaced its original complaint. (*See id.*); *see also Valadez-Lopez v. Chertoff*, 656 F.3d 851, 857 (9th Cir. Cal. 2011) ("[I]t is well-established that an amended complaint supersedes the original, the latter being treated thereafter as non-existent.") (internal quotation omitted). However, by the time Cray filed its amended complaint on October 16, 2015 (which merely added subsidiary infringement defenses and did nothing to cure the jurisdictional deficiencies, *see id.*) Raytheon had already filed the instant suit on September 25, 2015. Thus the instant case was the first— and only—proper suit addressing Cray's infringement, as well as any subsidiary defenses.

Second, Cray's Washington case was an anticipatory suit filed for the express purpose of preempting Raytheon's IIS business unit, which is responsible for the patents-in-suit, from filing

suit here in its home forum. (*See supra*, Sections II.A., II.C.) Such tactical, preemptive suits are a disfavored type of forum shopping. *See Mission Ins. Co. v. Puritan Fashions Corp.*, 706 F.2d 599, 602 n.3 (5th Cir. 1983). Moreover, by filing suit in the midst of ongoing license negotiations and threatening additional suits at the PTAB if Raytheon would not acquiesce to Cray's negotiation terms, Cray was attempting to gain leverage in ongoing negotiations—another disfavored tactic. *See EMC Corp. v. Norand Corp.*, 89 F.3d 807, 815 (Fed. Cir. 1996) (giving priority to DJ suits filed as a tactical measure to gain leverage in ongoing negotiations would "reward -- and indeed abet -- conduct which is inconsistent with the sound policy of promoting extrajudicial dispute resolution, and conservation of judicial resources").

Finally, if this Court were to determine that it should hold its decision on this motion in abeyance pending Judge Robart's decision on Raytheon's second motion to dismiss in the Washington case (briefing will conclude on December 18, 2015), Raytheon respectfully submits that this case should continue. Raytheon has already timely served detailed contentions and document production pursuant to P.R. 3-1 and 3-2. (*See supra*, Section II.E.) Cray will serve its invalidity contentions, if any, and document production pursuant to P.R. 3-3 and 3-4 on January 19, 2016. (*Id.*) This case is set to go to trial in March 2017 and the parties must be permitted to proceed with their cases. What's more, should this dispute nevertheless end up in Washington, the parties' ongoing efforts under this Court's Patent Rules will be useful in that case and the anticipated schedules are comparable in both cases. (*See* Stringfield Decl. at ¶¶ 29-30.)

## V.    CONCLUSION

For at least the reasons set forth above, Cray's motion to dismiss or transfer should be denied. Venue is appropriate in this Court and Cray's Washington amended complaint does not warrant dismissal or transfer. Alternatively, if the Court decides to hold its decision on the instant motion in abeyance, this case otherwise should be permitted to go forward.

Dated:  December 11, 2015

Respectfully Submitted,

By:  _/s/ William E. Davis, III_____
William E. Davis, III
Texas State Bar No. 24047416
THE DAVIS FIRM P.C.
213 N. Fredonia Street, Suite 230
Longview, Texas 75601
Telephone: (903) 230-9090
Facsimile: (903) 230-9661
E-mail: bdavis@bdavisfirm.com

**Of Counsel**

Thomas J. Filarski
Daniel S. Stringfield
Brian G. Fahrenbach
STEPTOE & JOHNSON LLP
115 South LaSalle Street, Suite 3100
Chicago, IL 60603
Phone:  (312) 577-1300
Email:   tfilarski@steptoe.com
            dstringfield@steptoe.com
            bfahrenbach@steptoe.com

**ATTORNEYS FOR PLAINTIFF
RAYTHEON COMPANY**

16

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document is being filed electronically in compliance with Local Rule CV-5(a).  As such, this document is being served on all counsel who are deemed to have consented to electronic service.  Local Rule CV-5(a)(3)(V).  Pursuant to Federal Rule of Civil Procedure 5(d) and Local Rule CV-5(d) and (e), any counsel of record not deemed to have consented to electronic service will be served with a true and correct copy of the foregoing by email on this 11th day of December, 2015.

/s/ William E. Davis, III
William E. Davis, III

# EXHIBIT 36



Print Page | Close Window

# NEWS RELEASE

## CRAY INC. REPORTS THIRD QUARTER 2011 FINANCIAL RESULTS

**Company Lands $97 Million Order to Upgrade Largest Supercomputer in U.S.**



SEATTLE, WA, Nov 01, 2011 -- Global supercomputer leader Cray Inc. (NASDAQ: CRAY) today announced financial results for the third quarter ended September 30, 2011. Revenue for the quarter was $36.7 million compared to $42.8 million in the prior year period. The company reported a net loss for the quarter of ($12.2 million) or ($0.35) per share compared to a net loss of ($18.8 million) or ($0.55) per share in the third quarter of 2010.

Total gross profit margin for the third quarter was 44 percent, compared to 25 percent in the third quarter of 2010. Product margin in the third quarter of 2011 was 30 percent and service margin was 55 percent.

Operating expenses declined slightly in the third quarter of 2011 to $28.6 million compared to $29.2 million in the prior year period. The third quarter 2011 results included restructuring costs of $0.7 million and non-cash items of $2.1 million for depreciation and amortization and $0.6 million related to stock compensation expense.

Revenue for the nine-month period ending September 30, 2011 was $144.5 million compared with $100.0 million in the prior year period. For the first nine months of 2011, total operating expenses were $75.3 million compared to $65.1 million in the prior year period. The higher operating expenses were due primarily to less R&D co-funding credits. Net loss was ($16.7 million) or ($0.48) per share for the first nine months of 2011, compared to a net loss of ($37.0 million) or ($1.08) per share in the prior year period. The nine-month period ending September 30, 2011 results included $1.9 million in restructuring costs and non-cash items of $6.4 million for depreciation and amortization and $2.7 million related to stock compensation expense.

As of September 30, 2011, cash balances totaled $92.0 million.

"We continue to make good progress on our roadmap and are well positioned as we head into the fourth quarter," said Peter Ungaro, president and CEO of Cray. "Our high-end supercomputer business is strong and growing. We just launched the XK6 supercomputer, which was instrumental in our huge win at Oak Ridge National Laboratory. Their new system will be nicknamed 'Titan' and with a peak performance of over 10 petaflops, is a significant step on our way to exascale computing. While we are working through some key supplier parts challenges, we have now shipped, or are in the process of shipping, the major systems considered in our 2011 outlook."

Ungaro added, "We're on track to launch solutions in new growth markets over the next several months, significantly broadening our product set and leveraging our market leading position in supercomputing. With a solid pipeline of new opportunities and an expanding set of solutions, I'm excited about where we're headed."

Outlook

A wide range of results remains possible for 2011 and the company's results are highly dependent on completing a handful of large transactions already contracted. Our 2011 outlook considers the impact of past and currently expected delays in receiving a key component for our systems. Total revenue for 2011 is anticipated to be in the range of $290-$320 million. Annual gross margins are expected to be in the mid-30 percent range and total operating expenses for 2011 are expected to be around $100 million. Based on this outlook, we expect to be profitable for 2011.

Actual results for any future period are subject to large fluctuations given the nature of Cray's business.

Recent Highlights

-- In October, Cray was awarded a $97 million contract with the Department of Energy's Oak Ridge National Laboratory to transform the highly-regarded Cray XT5 system nicknamed "Jaguar" into "Titan," a new Cray XK6 supercomputer that will have a peak performance of over 10 petaflops. Another milestone in the Company's collaborative partnership with Oak Ridge, this contract will provide the DOE's scientific community with one of the most powerful supercomputers in the world, paving the way for amazing scientific breakthroughs. The contract includes additional upgrade options that, if exercised, would

Appx599

increase the total value of the contract beyond $97 million.

-- In September, Cray received official notification of acceptance for a 24-cabinet upgrade to the Cray XE6 supercomputer nicknamed "Cielo" used by researchers and scientists from the U.S. National Nuclear Security Administration. The 96-cabinet Cray system is located at the Los Alamos National Laboratory in partnership with Sandia National Laboratories. As a result of this upgrade its users can now apply the resources of a petascale supercomputer towards running some of the largest and most demanding workloads involving modeling and simulation.

-- In August, Cray signed a contract to deliver a multi-cabinet Cray XE6 supercomputer to ExxonMobil, marking a significant return to the energy segment for Cray.

-- In October, Cray completed a $12 million development milestone for its Defense Advanced Research Projects Agency (DARPA) contract related to the development of its next-generation supercomputer, known as Cascade.

Conference Call Information

Cray will host a conference call today, Tuesday, November 1, 2011 at 1:30 p.m. PDT (4:30 p.m. EDT) to discuss 2011 third quarter financial results. To access the call, please dial into the conference at least 10 minutes prior to the beginning of the call at 1-877-941-6010. International callers should dial 1-480-629-9772. To listen to the live audio webcast, go to the Investors section of the Cray website at http://investors.cray.com.

If you are unable to attend the live conference call, an audio webcast replay will be available in the "Investors" section of the Cray website for 180 days. If you do not have Internet access, a replay of the call will be available by dialing 1-800-406-7325, international callers dial 1-303-590-3030, and entering the access code 4484976. The conference call replay will be available for 72 hours, beginning at 4:30 p.m. PDT on Tuesday, November 1, 2011.

About Cray Inc.

As a global leader in supercomputing, Cray provides highly advanced supercomputers and world-class services and support to government, industry and academia. Cray technology is

Appx600

designed to enable scientists and engineers to achieve remarkable breakthroughs by accelerating performance, improving efficiency and extending the capabilities of their most demanding applications. Cray's Adaptive Supercomputing vision is focused on delivering innovative next-generation products that integrate diverse processing technologies into a unified architecture, allowing customers to surpass today's limitations and meeting the market's continued demand for realized performance. Go to www.cray.com for more information.

Safe Harbor Statement

This press release contains forward-looking statements within the meaning of Section 21E of the Securities Exchange Act of 1934 and Section 27A of the Securities Act of 1933, including, but not limited to, statements related to Cray's financial guidance and expected future operating results, its product development plans, including its ability to complete solutions targeted at new growth markets, the expected delivery of Cray systems that have been ordered and the ability of systems delivered by Cray to meet the customer's requirements. These statements involve current expectations, forecasts of future events and other statements that are not historical facts. Inaccurate assumptions as well as known and unknown risks and uncertainties can affect the accuracy of forward-looking statements and cause actual results to differ materially from those anticipated by these forward-looking statements. Factors that could affect actual future events or results include, but are not limited to, the risk that Cray does not achieve the operational or financial results that it expects, the risk that the systems ordered by customers are not delivered when expected or do not perform as expected once delivered, the risk that customer acceptances are not received when expected or at all, the risk that Cray is not able to successfully complete its planned product development efforts, including delivering solutions targeted at new growth markets within the planned timeframes or at all, the risk that our estimate of the future costs to complete work under the DARPA contract increases materially and causes us to not be able to credit the expected portion of the milestone amount against fourth quarter 2011 expenses, the risk that the AMD "Interlagos" processor, shipments of which began later than originally anticipated, is not available to Cray in the necessary quantities when needed, the risk that the planned update to the NVIDIA's next generation "Kepler" GPUs are not available with the performance expected or when expected, the risk that certain planned U.S. government funding for Oak Ridge National Laboratory becomes unavailable before the lease-to-purchase contract is converted to a purchase contract through third-party lease financing and as a result Cray is not able to collect amounts expected under the contract, the risk that Cray is not able to achieve anticipated gross margin or expense levels, and such other risks as identified in the

Appx601

company's quarterly report on Form 10-Q for the period ended September 30, 2011, and from time to time in other reports filed by Cray with the U.S. Securities and Exchange Commission. You should not rely unduly on these forward-looking statements, which apply only as of the date of this release. Cray undertakes no duty to publicly announce or report revisions to these statements as new information becomes available that may change the company's expectations.

Cray is a registered trademark of Cray Inc. in the United States and other countries and Cray XK6, Cray XT5 and Cray XE6 are trademarks of Cray Inc. Other product and service names mentioned herein are the trademarks of their respective owners.

## CRAY INC. AND SUBSIDIARIES
## CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS
(Unaudited and in thousands, except per share data)

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2011 | 2010 | 2011 | 2010 |
| REVENUE: | | | | |
| Product | $ 15,988 | $ 23,462 | $ 80,338 | $ 41,780 |
| Service | 20,717 | 19,374 | 64,154 | 58,177 |
| Total revenue | 36,705 | 42,836 | 144,492 | 99,957 |
| COST OF REVENUE: | | | | |
| Cost of product revenue | 11,151 | 18,355 | 54,106 | 30,948 |
| Cost of service revenue | 9,270 | 13,741 | 31,148 | 40,317 |
| Total cost of revenue | 20,421 | 32,096 | 85,254 | 71,265 |
| Gross profit | 16,284 | 10,740 | 59,238 | 28,692 |
| OPERATING EXPENSES: | | | | |
| Research and development, net | 17,949 | 18,563 | 42,869 | 33,301 |
| Sales and marketing | 6,233 | 6,512 | 18,962 | 19,348 |
| General and administrative | 3,693 | 4,166 | 11,607 | 12,471 |
| Restructuring | 687 | 0 | 1,863 | 0 |

Appx602

Appx603

Appx604

# EXHIBIT A

Case 2:15-cv-01554-JRG-RSP   Document 69-2   Filed 07/13/16   Page 2 of 2 PageID #: 2665



## INVOICE

| INVOICE NBR | DATE | PAGE | PAYMENT TERMS |
|---|---|---|---|
| 12814 | 8/20/2015 | 1 of 1 | Net 30 Days |
| **CUSTOMER PO NUMBER:** | Quote #006-40-00000-dD38E | | |
| **CUSTOMER NUMBER:** | 81946 | | |
| **DUE DATE:** | 9/19/2015 | | |

**Ship To:**
TEXAS ADVANCED COMPUTING CENTER-HPC
UNIVERSITY OF TEXAS AT AUSTIN
JANIE C BUSHN
10100 BURNET ROAD, ROC **1**.101 (R8700)

**Customer Address:**
TEXAS ADVANCED COMPUTING CENTER-HPC
UNIVERSITY OF TEXAS AT AUSTIN
JANIE C BUSHN
10100 BURNET ROAD, ROC **1**.101 (R8700)

**REMIT TO:**

| By Check: | By Wire: |
|---|---|
| CRAY INC. | Wells Fargo Bank – Seattle, WA |
| NW-6050 | ABA: ▮ |
| PO BOX 1450 | ACCT: ▮ |
| 1801 PARKVIEW DR | SWIFT: ▮ |
| SHOREVIEW, MN 55126 | |

| Line Nbr | Part Number/Description | Amount |
|---|---|---|
| 001 | Racks,Doors,PDUs (Compute) | ▮ |
| 002 | Large memory Compute Nodes | ▮ |
| 003 | Large memory Compute Nodes | ▮ |
| 004 | Infiniband Switching | ▮ |
| 005 | Operating Systems | ▮ |
| 006 | Cables | ▮ |
| 007 | Installation and Other Service | ▮ |
| 008 | XC30 | ▮ |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

| Please Contact the Cray Invoice Department | | SUBTOTAL | TAX | BALANCE DUE |
|---|---|---|---|---|
| (206) 701-2172 with questions. | **USD** | ▮ | | ▮ |

Cray Inc – 901 Fifth Avenue, Suite 1000 - Seattle, WA 98164 USA

**Appx623**

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitations of Fed. R. App. P. 21(d)(1) because this brief contains 6,856 words, excluding the parts of the brief exempted by Fed. R. App. P. 21(a)(2)(C), 32(f), and Fed. Cir. R. 32(b), as counted by Microsoft[®] Word 2010, the word processing software used to prepare this brief.

This brief complies with the requirements of Fed. R. App. P. 32(c)(2) because this brief has been prepared in a proportionally spaced typeface using Microsoft[®] Word 2010, Times New Roman, 14 point.

Dated: August 1, 2017          /s/ *John Josef Molenda*
                                John Josef Molenda
                                STEPTOE & JOHNSON LLP
                                1114 Avenue of the Americas, 35th Floor
                                New York, NY 10036
                                Phone: (212) 506-3900

                                *Counsel for Respondent Raytheon Company*

## CERTIFICATE OF SERVICE

I hereby certify that, on the 1st day of August, 2017, I electronically filed the foregoing with the Clerk of Court using the CM/ECF System upon all counsel of record.

I further certify that this Response to Petition for Writ of Mandamus will be served via FedEx delivery to the courtroom deputy to:

The Honorable Rodney Gilstrap
Sam B. Hall, Jr. Federal Building and United States Courthouse
100 East Houston Street
Marshall, TX 75670


Dated: August 1, 2017                    /s/ *John Josef Molenda*
                                         John Josef Molenda
                                         STEPTOE & JOHNSON LLP
                                         1114 Avenue of the Americas, 35th Floor
                                         New York, NY 10036
                                         Phone:  (212) 506-3900

                                         *Counsel for Respondent Raytheon Company*